**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Marc A Wichansky, | No. CV-13-01208-PHX-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| David T. Zowine, et al., | |
| Defendants. | |

Defendants have filed a renewed motion for judgment as a matter of law and motion for a new trial. Doc. 568. The issues are fully briefed (Docs. 581, 583), and no party has requested oral argument. For the reasons that follow, the Court will reduce some of the punitive damages awards, but otherwise deny Defendants' motions.

**I.     Background.**

Following nine days of trial, the jury found that Defendant David Zowine had breached his fiduciary duties to Plaintiff, and that Defendants Charles Johnson, Martha Leon, Pat Shanahan, and Mike Ilardo had aided and abetted Zowine's breach. Doc. 500. The jury awarded $27,625,500 in compensatory and punitive damages against these Defendants, with most of the damages assessed against Defendant Zowine. *See id.* The Court entered judgment consistent with the jury's verdict. *See* Doc. 535.

After the close of Plaintiff's evidence at trial, Defendants made an oral Rule 50(a) motion for judgment as a matter of law, which the Court took under advisement. *See* Doc. 474. The Court later denied the motion in part (Doc. 465) and granted it in part (Doc. 478). Defendants now seek post-trial relief from the verdict.

## II.     Legal Standard.

### A.     Rule 50(b): Renewed Motion for Judgment as a Matter of Law.

A party may renew its motion for judgment as a matter of law under Rule 50(b) if the court denies the Rule 50(a) motion and the jury returns a verdict against the movant. *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009).  "Because it is a renewed motion, a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion."  *Id.*  Thus, a "party cannot raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion."  *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003).

In evaluating a motion for judgment as a matter of law, a court does not make credibility determinations or weigh the evidence.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).  Instead, the court "must draw all reasonable inferences in favor of the nonmoving party."  *Id.* at 150 (citations omitted).  A court can grant a Rule 50 motion and overturn the jury's verdict only if "'there is no legally sufficient basis for a reasonable jury to find for that party on that issue.'"  *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 859 (9th Cir. 2002) (quoting *Reeves*, 530 U.S. at 149), *aff'd*, 539 U.S. 90 (2003).  In other words, the "jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion."  *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

### B.     Rule 59(a): Motion for a New Trial.

Under Rule 59(a), a new trial may be granted on all or some of the issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  Because "Rule 59 does not specify the grounds on which a motion for a new trial may be granted," the court is bound by historically recognized grounds.  *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003).  These include verdicts against the weight of the evidence, damages that are

excessive, and trials that were not fair to the moving party.  *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007); *see also Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000) ("The trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice.") (citation omitted).

Although the Court may weigh the evidence and assess the credibility of witnesses when ruling on a Rule 59(a) motion, it may not grant a new trial "merely because it might have come to a different result from that reached by the jury." *Roy v. Volkswagen of Am., Inc.*, 896 F.2d 1174, 1176 (9th Cir. 1990) (quotation marks and citation omitted); *see also Union Oil Co. of Cal. v. Terrible Herbst, Inc.*, 331 F.3d 735, 743 (9th Cir. 2003) ("It is not the courts' place to substitute our evaluations for those of the jurors.").  A court will not approve a miscarriage of justice, but "a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter." *Landes Constr. Co., Inc. v. Royal Bank of Can.*, 833 F.2d 1365, 1371 (9th Cir. 1987) (citations omitted).

### C.   Discussion of the Evidence in this Order.

When discussing the evidence in this Order, the Court will draw reasonable inferences in Plaintiff's favor.  The Court will describe the evidence as the jury reasonably could have viewed it in reaching the verdict.  Defendants will not agree with the Court's description because it reflects the view a reasonable jury could have adopted in ruling against them, but the Court will not entertain any finding that is against the clear weight of the evidence.  The Court will provide citations to some of the evidence in the record, but by no means to all of the relevant evidence.  Occasionally, the Court will simply reference the testimony of particular witnesses rather than provide specific page citations.

1    **III.    Statute of Limitations – Accrual and Fraudulent Concealment.**[1]

2        The parties agree that Plaintiff's claim for breach of fiduciary duty against

3    Defendant David Zowine is governed by Arizona's two-year limitations period for torts.

4    A.R.S. § 12-542.  This action was filed on June 14, 2013.  Thus, Plaintiff's claim is

5    timely if it accrued, or the limitations period was tolled until a date, after June 14, 2011.

6        **A.    Accrual of Plaintiff's Claim.**

7        Defendants argue that Plaintiff's fiduciary duty claim against David Zowine

8    accrued before June 14, 2011.  Doc. 568 at 3.[2]  Defendants note that a number of

9    witnesses testified that Plaintiff was aware of medical billing issues in 2009 and 2010.  In

10   addition, Plaintiff testified that his interpersonal conflict with Zowine began in late 2010,

11   continued into 2011, and ultimately culminated in Plaintiff seeking dissolution of Zoel

12   Holding Company, Inc. ("Zoel"), which he co-owned with Zowine.  Doc. 492 at 84-89.

13       Defendants contend, pursuant to *Walk v. Ring*, 44 P.3d 990 (Ariz. 2002), that the

14   evidence shows that Plaintiff's fiduciary duty claim accrued in 2009 or 2010, well outside

15   of the two-year statute of limitations period.  Plaintiff's knowledge of billing issues and

16   Zowine's hostile conduct, Defendants assert, triggered a duty to investigate in 2010 and

17   early 2011.[3]

18   _____

19       [1] On August 4, 2016, Defendants David and Karina Zowine notified the Court that

20   they have filed for Chapter 11 bankruptcy protection.  *See* Doc. 589.  Further proceedings
     with respect to the Zowines have therefore been stayed.  *See* Doc. 590.  The Court must

21   address portions of the Rule 50(b) motion that involve David Zowine, however, because
     the aiding and abetting claims against the other Defendants are derivative and the case

22   against those Defendants has not been stayed.

23       [2] Citations to the docket are to page number added to the top of each page by the
     Court's CM/ECF system, not to original page numbers on the document.

24       [3] Curiously, after relying on *Walk* in their motion, Defendants argue in their reply

25   that "*Walk* does not apply."  Doc. 583 at 2.  The reply argues that *Walk* is inapposite
     because the defendant in *Walk* had "specialized knowledge" of the underlying harmful

26   conduct that is absent here.  The Court does not find *Walk* so limited.  The Arizona
     Supreme Court articulated a standard applicable to breaches of fiduciary duty – the very

27   kind of duty at issue in this case.  44 P.3d at 998.  In addition, even if specialized
     knowledge of the defendant was required, the jury in this case reasonably could have

28   found that Zowine possessed such knowledge because he was, as several witnesses
     testified, in charge of medical billing at the company and knew of the fraud being
     perpetrated.

*Walk* holds that a claim accrues when an aggrieved party has "reason to connect the 'what' to a particular 'who' in such a way that a reasonable person would be on notice to investigate whether the injury might result from fault." *Id.* at 996, ¶ 22.  The Arizona Supreme Court provided this additional explanation:

> The "what" is the fact of injury.  With respect to those in a professional or fiduciary relationship with the tortfeasor, an adverse or untoward result, or a failure to achieve an expected result, is not, as a matter of law, always sufficient notice.  To trigger the statute of limitations, something more is required than the mere knowledge that one has suffered an adverse result while under the care of a professional fiduciary.

*Id.* at 997, ¶ 26.

As Defendants contend, Plaintiff did know that there were medical billing issues at Zoel in 2009 and 2010, even if he did not know they were caused by intentional fraud. He also knew that his relationship with Zowine deteriorated in late 2010 and early 2011. Plaintiff thus may have known enough about the "what" of his injury to trigger a duty to investigate, but that is not sufficient under *Walk*.  Because Plaintiff and Zowine were in a fiduciary relationship, Plaintiff must also have known the "who" – that Zowine was behind the billing fraud and was deliberately causing the difficulties with Plaintiff.  *Id.*

Plaintiff testified that he knew of billing issues in 2010, but had no idea that intentional billing fraud was occurring or that Zowine was involved in the fraud and trying to cover it up.  Plaintiff also knew that his relationship with Zowine became strained in late 2010 and early 2011, but testified that he thought this was due to Zowine's gambling issues.  Plaintiff had no idea that the difficulties were intentionally caused by Zowine in order to drive Plaintiff from the business and prevent discovery of the billing fraud.  Plaintiff's claim for breach of fiduciary duty was not based merely on the existence of billing issues or difficulties in his relationship with Zowine.  Rather, Plaintiff's claim was that Zowine breached his fiduciary duties by knowingly engaging in billing fraud, attempting to conceal it, and engaging in a campaign of intimidation and

harassment designed to drive Plaintiff from the business before it could be discovered.[4]

Plaintiff testified that he had no reason to connect Zowine to the wrongdoing until he received a report on the medical billing fraud from Ron Wise in August 2011 ("Wise Report"), which discussed several forms of billing fraud that were occurring at Zoel. Doc. 516 at 29-30.  After receiving the Wise Report, Plaintiff testified that "[i]t became very clear there [were] a lot of different fraudulent activities [and] that [Ron Wise] was showing me exactly how they were being done, exactly how it was being pulled off, and who was covering it up."  *Id.* at 30.  Plaintiff testified that, after reviewing the Wise Report, he "realized . . . this is intentional, this fraud was intentional," and he "started to believe in hindsight at some point that all of these fights, everything was coming together, was just a big act to – because Richard [Eden] and I were sniffing into the medical billing fraud."  Doc. 493 at 10.

Whether to credit this version of events was a question reserved for the jury. *Reeves*, 530 U.S. at 150-51.  If the jury chose to believe Plaintiff's testimony, as it evidently did, it could reasonably conclude that Plaintiff had no reason to connect Zowine to the wrongdoing prior to receiving the Wise Report in August 2011.

Defendants try to discredit Plaintiff's testimony, arguing that (1) the Wise Report did not specifically link Zowine to any wrongful conduct, and (2) the Report was based on information readily available to Plaintiff.  *See* Doc. 583 at 3.  These are the very arguments Defendants made during trial, and they support one possible interpretation of the evidence.  But it is by no means the only possible interpretation.  The jury could reasonably have believed Plaintiff's testimony that he did not have reason to connect

---

[4] Plaintiff clearly knew in 2010 and early 2011 that Zowine was mistreating him, including in the physical assault that occurred in January 2011.  In this respect, Plaintiff knew the "who" of his personal or physical injuries during that time, and his claims for such injuries are time-barred.  The Court accordingly entered summary judgment on these claims.  Doc. 308 at 8.  But as the Court explained in its summary judgment ruling, to the extent that the gravamen of Plaintiff's claim is the financial injury he later suffered from losing his interest in Zoel, Defendants had to show that Plaintiff knew the "who" of that injury – that Zowine was trying to drive him from the company to cover fraud – before the statute of limitations was triggered.  *Id.*  This factual issue precluded summary judgment for Defendants and was extensively litigated at trial.

Zowine to the wrongful conduct until he read the Wise Report.  Given this credibility determination, the Court cannot conclude that there was no legally sufficient basis for a reasonable jury to find for Plaintiff on this issue, *Costa*, 299 F.3d at 859, or that it was against the clear weight of the evidence, *Molski*, 481 F.3d at 729.  The Court accordingly cannot conclude that Defendants are entitled to judgment based on the statute of limitations.

*Walk* further provides that, in determining whether a plaintiff was on notice sufficient to trigger the limitations period, the question is whether the plaintiff's "failure to go forward and investigate [his possible cause of action] is not reasonably justified." 44 P.3d at 996.  For example, a plaintiff would be reasonably justified in declining to investigate a claim if the plaintiff "subjectively believed" that the defendant had done nothing wrong.  *Id.* (citation omitted).  The question is whether a reasonable person in the plaintiff's position would investigate the claim.  *Id.*

Thus, even if Plaintiff knew, prior to the limitations period, that billing irregularities were occurring or difficulties had arisen in his relationship with Zowine, the claim for breach of fiduciary duty did not accrue until he knew that Zowine was involved in the billing fraud and began mistreating Plaintiff to drive him from the company and prevent its discovery.  The jury reasonably could have concluded that Plaintiff did not have such knowledge before June 14, 2011.  Plaintiff testified that he and Zowine had been friends and business partners for many years, and that Zowine was the best man at his wedding.  Doc. 492 at 39-40, 57-58.  Defendant Ilardo testified that Plaintiff and Zowine were "were like brothers.  They got along great.  Their families were very close. You know, the best of friends."  Doc. 495 at 6.  There clearly was sufficient evidence for the jury to believe Plaintiff's claim that he never suspected Zowine would be involved in fraudulent operation of the business they jointly owned.  As *Walk* explains, "[t]his is the very sort of factual determination that must be left to the jury."  44 P.3d at 996, ¶ 24.[5]

---

[5] Defendants argue that Plaintiff sustained appreciable, irremediable, and non-speculative harm before June 14, 2011.  The Court agrees.  Plaintiff's damages expert testified, with hindsight, that Plaintiff's profits from Zoel in 2010 would have been more

## B.      Fraudulent Concealment.

Even if Plaintiff's claim otherwise would have accrued before June 14, 2011, the claim is timely if the limitations period was tolled by fraudulent concealment.  In *Walk*, the Arizona Supreme Court held that "[f]raud practiced to conceal a cause of action will prevent the running of the statute of limitations until its discovery."  44 P.3d at 999, ¶ 34 (quotation marks and citation omitted).

> Moreover, if fraudulent concealment is established, the [plaintiff] is relieved of the duty of diligent investigation required by the discovery rule and the statute of limitations is tolled until such concealment is discovered, or reasonably should have been discovered.  In fraudulent concealment cases, the duty to investigate arises only when the [plaintiff] discovers or is put upon reasonable notice of the breach of trust.  Thus, our cases and those from other jurisdictions that recognize a fiduciary relationship agree that an actual knowledge standard applies to triggering the statute of limitations for a plaintiff who establishes a breach of the fiduciary duty of disclosure.

*Id.* at ¶ 35 (internal quotation marks and citations omitted).

### 1.      Alleged Termination of Fiduciary Duties.

Defendants argue in their reply brief that the statute of limitations was not tolled by withholding information in violation of fiduciary duties because any such duties owed by Zowine to Plaintiff ceased once their relationship became adversarial.  Doc. 583 at 2. The Court rejected this position in a written order (Doc. 481 at 6), declining to instruct the jury that fiduciary duties end when parties become adverse (*see* Doc. 533 at 12-13). The Court is convinced that this position is correct for reasons stated in its prior order. *See* Doc. 481 at 6.  Moreover, even if the law did provide that fiduciary duties end when relationships become adverse, such a rule surely would not apply when one partner intentionally makes the relationship adverse in order to drive the other partner from the business and prevent discovery of fraud, as Plaintiff proved here.

---

than $2.6 million – rather than the lower amount Plaintiff actually received – but for Defendants' wrongdoing.  Doc. 493 at 78-81.  The fact that Plaintiff was injured before June 14, 2011, however, is not enough to trigger the statute of limitations if he did not have the knowledge required by *Walk*, as the jury reasonably could have found.

## 2.    Sufficiency of the Evidence.

"In fraudulent concealment cases, the duty to investigate arises only when the [plaintiff] discovers or is put upon reasonable notice of the breach of trust." *Walk*, 44 P.3d at 999, ¶ 35 (quotation marks and citations omitted).    To establish notice, Defendants point to several different witnesses' testimony.  Doc. 568 at 5.  The question, however, is not whether there was evidence to support Defendants' position, but whether there was sufficient evidence to support Plaintiff's.  As already noted, Plaintiff presented evidence that he and Zowine had been friends and business partners for many years. Doc. 492 at 39-40, 57-58; Doc. 495 at 6.   Plaintiff testified that he never suspected Zowine would be involved in fraudulent operation of the business they jointly owned, or that the difficulties between them were part of a calculated effort by Zowine to drive him from the business and conceal fraud.  Plaintiff asserted that he did not begin to suspect Zowine's breaches until he received the Wise Report in August 2011.  Doc. 516 at 29-30. A reasonable jury could believe this evidence.

Plaintiff also presented evidence that Zowine was aware of and failed to disclose billing fraud, orchestrated a campaign to drive Plaintiff from the company, and interfered with efforts to uncover billing fraud.   For example, Plaintiff presented a number of witnesses who testified that that Zowine was responsible for billing at Zoel, that Johnson and Leon (who were alleged to be most directly involved in the fraud) reported to Zowine, and that Johnson and Leon repeatedly refused to cooperate with Plaintiff's and Richard Eden's efforts to learn more about the billing irregularities.  *See*, *e.g.*, Doc. 476 at 94-95, 106, 111; 479 at 23-24, 29-30, 33-40, 49-50.  Plaintiff also presented evidence that, in response to revelations of billing irregularities, Zowine retained a lawyer, Julie Nelson, purportedly to investigate billing fraud (Doc. 491 at 126-29), but actually to advocate on Zowine's behalf (Doc. 516 at 133).  In purportedly investigating the billing problems, Ms. Nelson never spoke with key individuals, including Defendant Leon, and never reviewed Leon's spreadsheets, which were a primary source of the billing fraud. Doc. 491 at 126-29.  Zowine even tried to turn the tables by claiming in a letter from

- 9 -

counsel that Plaintiff was in charge of medical billing – when, in fact, Zowine was in charge – and that Plaintiff had refused Zowine access to key documents and individuals, including Leon – when, in fact, Zowine supervised Leon and acquiesced in her refusal to provide billing information to Plaintiff.  *Id.* at 152-55.  In addition, Zowine and the other Defendants and employees associated with him systematically embarrassed, humiliated, and threatened not only Plaintiff (Docs. 479 at 61, 97-98, 105-07; 486 at 109-10; 492 at 90-91; 493 at 38-39), but also a number of other people associated with Plaintiff, including Zoel employees and Plaintiff's family members (Docs. 476 at 35, 38-39, 49-50, 55-56; 477 at 84-87, 141; 479 at 54, 58-59, 76, 100-01; 482 at 115; 483 at 82, 87, 94-97, 108, 124-25, 133; 485 at 32-33, 53; 487 at 129, 134-35; 491 at 18, 42; 516 at 23-24).

From this and other evidence, a reasonable jury could find that Zowine consciously attempted to hide the fraud and blame Plaintiff for billing irregularities, and that the difficulties between Plaintiff and Zowine were in fact a calculated effort by Zowine – unknown to Plaintiff at the time – to drive Plaintiff from the business and prevent discovery of the billing fraud.  The evidence supports Plaintiff's claim of fraudulent concealment and the tolling of the statute of limitations.

What is more, *Walk* explains that "if fraudulent concealment is established, the [plaintiff] is relieved of the duty of diligent investigation required by the discovery rule and the statute of limitations is tolled 'until such concealment is discovered, or reasonably should have been discovered.'"  44 P.3d at 999, ¶ 35.  Thus, the jury's reasonable finding of Zowine's fraudulent concealment would have relieved Plaintiff of the duty of diligent investigation until Plaintiff discovered the fraud after reviewing the Wise report in August 2011.

Finally, "an actual knowledge standard applies to triggering the statute of limitations for a plaintiff who establishes a breach of the fiduciary duty of disclosure." *Id.*  The Court instructed the jury that shareholders in a closely-held corporation must "fully disclose to one another all material facts relating to the corporation's affairs within their knowledge."  Doc. 533 at 13.  The evidence at trial supported a jury determination

1    that Zowine never disclosed to Plaintiff the existence of billing fraud or that he was
2    seeking to drive Plaintiff from the company.  In light of this nondisclosure under *Walk*,
3    the limitations period was not triggered until Plaintiff had "actual knowledge" of
4    Zowine's breach.  44 P.3d at 999, ¶ 35.[6]

### C.    Statute of Limitations Conclusion.

6          To be entitled to judgment as a matter of law or a new trial, Defendants must show
7    not only that Plaintiff's fiduciary duty claim against Zowine accrued before June 14,
8    2011, but also that the running of the statute of limitations was not tolled.  Defendants fail
9    on both counts.  Examining the evidence in the light most favorable to the jury verdict,
10   the Court finds ample evidence for a reasonable jury to find for Plaintiff on the statute of
11   limitations issues.  *Costa*, 299 F.3d at 859.  The Court cannot conclude that the jury's
12   findings were against the clear weight of the evidence.  *Molski*, 481 F.3d at 729.  This
13   case ultimately was a credibility determination by the jury, one the Court will not disturb.

### IV.    Causal Nexus between Defendants' Conduct and Plaintiff's Damages.

15         Defendants contend that "[t]here is no proximate causation between the claimed
16   billing issues and the harm to Plaintiff," arguing instead that Plaintiff's decision to seek
17   dissolution of Zoel was a "self-inflicted wound" that occurred after Plaintiff consulted
18   with competent legal counsel.  Doc. 568 at 5.  It is true that Plaintiff filed the petition for
19   dissolution of Zoel, setting in motion the judicial process that resulted in Zowine's
20   purchase of Plaintiff's shares in Zoel.  And granted, at first blush, it seems unlikely that
21   Plaintiff's own request to dissolve Zoel could eventually lead to his recovering damages
22   from Zowine for the dissolution.

---

[6] Plaintiff argues that Defendants waived their fraudulent concealment argument
by not raising it in their Rule 50(a) motion.  Although Defendants did not use the term
"fraudulent concealment" when arguing their motion, they did argue that Plaintiff's
fiduciary duty claim was barred by the statute of limitations (Doc. 495 at 160-61) and
they did cite *Walk*, 44 P.3d 990, which permits the tolling of a limitations period based on
fraudulent concealment.  The Ninth Circuit has explained that "Rule 50(b) 'may be
satisfied by an ambiguous or inartfully made motion' under Rule 50(a)."  *See Go Daddy
Software*, 581 F.3d at 961 (quoting *Reeves*, 881 F.2d at 1498).  The Court concludes that
Defendants sufficiently raised this argument in their Rule 50(a) motion, and it may be
renewed in their Rule 50(b) motion.

But Plaintiff's theory of this case from the beginning has been that his request for dissolution resulted from Zowine's deliberate campaign of harassment and intimidation designed to drive Plaintiff from the business before fraud could be discovered, and this claim was thoroughly vetted before the jury. The jury heard much testimony, from both sides, about the events leading up to Plaintiff's petition for dissolution. The jury heard extensive testimony from Plaintiff about why he sought to dissolve Zoel and what caused his decision. Because Plaintiff's state of mind in seeking dissolution was squarely at issue, the Court even allowed Defendants to obtain discovery of Plaintiff's communications with his lawyers about the dissolution decision. Doc. 233. Those communications were presented to the jury, and Plaintiff's lawyers testified at trial about them. After hearing all of this evidence and strenuous arguments by defense counsel, the jury found that Plaintiff's loss of his interest in Zoel was caused by Zowine and the other Defendants. This decision was amply supported by the evidence.

As an initial matter, the Court notes that there was highly convincing evidence that intentional billing fraud was occurring at Zoel. Plaintiff's expert, Ron Wise, testified that MGA – the Zoel subsidiary responsible for medical billing – intentionally overbilled insurance companies and the Arizona Health Care Cost Containment System ("AHCCCS") for home health services provided by MGA nurses. He estimated that at least 12,000 hours were overbilled by rounding upward the actual time incurred by the MGA nurses. In some cases, the hours were doubled. He testified that another 19,833 hours were billed at rates higher than the contracts with the insurers or AHCCCS allowed, that home nursing services for children were billed for times when the children were at school, and that the same nursing services were billed to more than one insurer. He also found that the MGA accounting system was structured in a way that made detection of the fraud very difficult. Doc. 490 at 88-112. Wise found that the person primarily responsible for the billing practices was Martha Leon. *Id.* at 101-102.

This is not all. Wendy Britton, who has 30 years of medical fraud investigation experience, testified that MGA methodically manipulated data to engage in at least eight

different kinds of medical billing fraud.   Doc. 490 at 35-53.   Ms. Britton provided specific examples of the various kinds of fraud.   *Id.*   In addition, the AHCCCS investigator who looked into billing at MGA found credible allegations of fraud. Doc. 491 at 85-88.  She was not able to complete her investigation because MGA – under the leadership of Zowine and after Plaintiff's interest in the company had been purchased by Zowine – reached a settlement with AHCCCS under which it paid $1,250,000.  *Id.* at 65, 85-88.  Other evidence also suggested that Ms. Leon was primarily responsible for the billing fraud, including her own repeatedly-inconsistent testimony, both in depositions and at trial.   And the evidence demonstrated that Ms. Leon reported to Charles Johnson, who reported to David Zowine.

In addition, as noted above, Plaintiff presented substantial evidence that Leon and Johnson refused to cooperate when Plaintiff, through Richard Eden, began investigating billing issues.  When Richard Eden's investigation began encountering resistance from Leon and Johnson, and Eden persisted, Zowine became openly hostile to Eden, calling him a "whiny bitch," throwing a baby pacifier at him in the office, making obscene suggestions to him and Plaintiff in the office, and attempting to fire him.  Doc. 479 at 54-60.  As also noted above, Zowine hired a lawyer to "investigate" the fraud, but she in fact became his advocate and did little to conduct an investigation.  Zowine even asserted through his lawyer that Plaintiff, not Zowine, was responsible for billing at Zoel, despite overwhelming evidence to the contrary.

When a receiver was appointed by the state court to oversee the operations of Zoel, the evidence showed that Zowine harassed, interfered with, and refused to cooperate with the receiver, particularly in any fraud investigation.  This included not only resistance in the office, but attempts by Zowine to humiliate the receiver in public. *See* Doc. 487, 488 (testimony of Edward Burr).

From all of this, the jury had ample evidence to support a finding that Zowine and his associates were engaged in deliberate and substantial billing fraud at Zoel, and sought diligently to prevent its discovery.

The jury also heard substantial evidence about the campaign Zowine and his associates undertook to harass and intimidate Plaintiff to drive him from the company. The Court will not recount all of that evidence in this order, but much of it is identified in the record citations in Plaintiff's response.  *See* Doc. 581 at 8-11.  These actions included belittling and embarrassing Plaintiff, often in front of the company's staff; sending Plaintiff offensive and degrading emails, often copied to others in the office[7]; physically assaulting Plaintiff[8]; surreptitiously moving Zowine's part of the business out of the office and to another location; later forcibly removing the company's server from Plaintiff's location to Zowine's location; having Charles Johnson appear at Plaintiff's office, with legal papers, and inform the employees that they were not to work with or communicate with Plaintiff; and threatening, berating, and intimidating those who continued to show loyalty to Plaintiff.  This conduct was described in the testimony of Richard Eden, Jennifer Frankito, Justin Pack, Garrett Brill, Plaintiff, and others. Witnesses testified that Zowine, who is a large and physical man, was intimidating. Edward Burr – the state-court appointed receiver – testified that Zowine had a "cult-like" influence over those loyal to him and was "meanspirited."  Docs. 487 at 150, 488 at 45. Jennifer Frankito described Zowine and his associates as a "pack of wolves."  Doc. 483 at 133.  Plaintiff testified that he was afraid of Zowine during this time because Zowine generally walked around the office in a group, "almost like a posse of people.  It wasn't just Dave who was already intimidating enough, but he walked in a group that was like – to me, it seemed like a gang."  Doc. 495 at 112.  Several witnesses testified that women on Plaintiff's staff would lock themselves in their offices or leave the premises when Zowine's associates, including Shanahan and Ilardo, came to Plaintiff's office after the

---

[7] Examples include emails Zowine sent to Plaintiff in January of 2011 calling him a "spineless little bitch" (Trial Ex. 630), mocking him as "Mr. President" (Ex. 179), and calling him a "big pussy" (Ex. 105).

[8] Plaintiff testified that Zowine, who is considerably larger than Plaintiff, entered Plaintiff's office, closed the door, grabbed Plaintiff by the neck, called him "El Presidente," threw him across the office to the floor, knocking things off the wall, and jumped on him.  Doc. 495 at 111.

offices split.  Plaintiff testified that the situation eventually became unbearable and he sought dissolution of the company and appointment of a receiver to manage it.

From this evidence, a reasonable jury could conclude that (a) Zowine and his associates were engaged in willful and substantial billing fraud unknown to Plaintiff; (b) Zowine sought to prevent Plaintiff from discovering the fraud; (c) when Plaintiff and Richard Eden persisted, Zowine and others undertook an intentional campaign to drive Plaintiff from the business; (d) the unrelenting campaign of harassment led Plaintiff to file for dissolution of the business and seek appointment of a receiver; and (e) as a result, Plaintiff lost his valuable interest in the business and millions of dollars he would have earned had Zowine and the other Defendants not engaged in their deliberate course of conduct.  Such conclusions, supported by sufficient evidence, plainly satisfy the requirement of causation.[9]

In their reply, Defendants argue that Plaintiff's theory of causation fails because it (1) relies on conduct post-dating Plaintiff's filing for dissolution, and (2) relies on conduct that Plaintiff did not know about when he filed for dissolution.  Doc. 583 at 4.  But the events described above, with the exception of Zowine's interference with the receiver, all occurred before Plaintiff sought dissolution.  Defendants ignore Plaintiff's testimony that the medical billing issues and Defendants' harassment were the motivation for his decision to seek dissolution.  Docs. 493 at 68; 516 at 34, 39-40.  This testimony directly links Defendants' pre-filing conduct with Plaintiff's decision.

The Court concludes that there was a legally sufficient basis for a reasonable jury to find for Plaintiff on the issue of causation.  *Costa*, 299 F.3d at 859.  The jury's finding was not against the clear weight of the evidence.  *Molski*, 481 F.3d at 729.

## V.    Fiduciary Duty Jury Instructions.

Defendants challenge portions of the Court's fiduciary duty jury instructions.

---

[9] Defendants' counsel argued strenuously in closing argument that Plaintiff had failed to prove causation.  Doc. 518 at 93-95.  He even called it "the most important" issue the jury had to decide.  *Id.* at 120.  The jury nonetheless found causation.

### A.    Waiver.

Plaintiff contends that Defendants waived this issue by failing to renew it in the joint pretrial order or in Defendants' Rule 50(a) motion during trial.  Doc. 581 at 11-12.  Defendants raised the issue several times in the proposed joint pretrial order, stating that the nature of the fiduciary relationship changed once the parties' positions became adversarial.  *See* Doc. 345-1 at 8, 13, 16, 19-21.  Defendants subsequently renewed the issue each time jury instructions were discussed (*see* Docs. 342 at 91; 486 at 168-71), although the Court ultimately declined to adopt Defendants' position (Docs. 481 at 6; 533 at 12-13).  Defendants did not reassert this issue in their Rule 50(a) motion (*see* Doc. 495 at 159-184), but this does not result in waiver.  A Rule 50(a) motion focuses on the sufficiency of the non-movant's evidence, not issues of law.  And even if waiver occurred, the Court may properly consider jury instruction issues in a Rule 59(a) motion.  *Coach, Inc. v. Siskiyou Buckle Co.*, No. 3:11-CV-00486-HZ, 2012 WL 5303662, at *2 (D. Or. Oct. 25, 2012) (citing *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990)).

### B.    Jury Instructions.

Defendants cite A.R.S. §§ 10-830, 10-840, without elaboration, as setting out the "exclusive director fiduciary duties" in a corporation.  *Id.*  These statutes concern the fiduciary duties of directors and officers of corporations.  The Court drafted a jury instruction based on these statutes that defined Zowine's fiduciary duties as a director and officer of Zoel.  Doc. 454 at 12.  Indeed, Zowine's counsel agreed that this instruction was "absolutely dead on" and asked that it be given to the jury.  Doc. 486 at 155.  The Court gave the instruction (Doc. 533 at 12), and the jury found Zowine liable for breaching his fiduciary duties as a director and officer of Zoel – by clear and convincing evidence (Doc. 500 at 1; Doc. 533 at 12).

Because Zowine and Plaintiff were also each 50% shareholders of Zoel, the Court gave an instruction on the fiduciary duties of shareholders in a close corporation.  Doc. 533 at 13.  Zowine objected, arguing that any common law fiduciary duties of

shareholders had been abrogated by A.R.S. §§ 10-830, 10-840.  The Court disagreed, and explained its reasons in a detailed order.  Doc. 481 at 7-10; *see also* Doc. 454 at 14.  The jury found that Zowine had breached his fiduciary duties as a shareholder.  Doc. 500 at 2.  Defendants do not appear to argue that this instruction was incorrect.

Defendants' present motion argues that the Court erred in not instructing the jury that "Arizona law does not prohibit corporate officers, directors, and shareholders from disputing how to operate the corporation, even to the point of deadlock or hostile takeovers."  Doc. 568 at 6.  Defendants also argue that the jury should have been told that "once a dispute has reached the stage of deadlock and dissolution, fiduciary duties are substantially limited by the open and obvious conflict to only those duties necessary to the winding up of corporate affairs."  *Id.* (citation omitted).

Defendants correctly note that directors, officers, and shareholders do not breach fiduciary duties by taking good faith actions that result in corporate deadlock.  *See* A.R.S. § 10-1430(B)(1) (allowing for dissolution in the event of corporate deadlock); *Herbert v. Porter*, 845 N.E.2d 574, 579 (Ohio Ct. App. 2006) (no breach of fiduciary duty where shareholder voted in good faith for director of choice, even though it resulted in corporate deadlock).  But this case never has been about a good faith disagreement that led to a corporate deadlock.  Plaintiff's theory throughout this litigation has been that Zowine knew of and failed to disclose billing fraud at Zoel, interfered with efforts to uncover the billing fraud, and orchestrated a campaign to drive Plaintiff from the company in an effort to conceal the fraud.  The issue of good-faith corporate deadlock was irrelevant to determining whether Zowine breached his fiduciary duties in the manner alleged.

Moreover, the Court's instruction on the duties of directors and officers fully supported any defense Zowine wished to assert.  It informed the jury that Zowine was required "to discharge his duties in good faith and with the care an ordinarily prudent person in a like position would exercise under similar circumstances."  Doc. 533 at 12.  Further, Zowine was to "fulfill his responsibilities in a manner that he reasonably believe[d] to be in the best interests of the corporation."  *Id.*  The jury was told that

Zowine could "rely on information, opinions, reports, or statements prepared by an officer or employee of the corporation whom the director reasonably believes is reliable and competent in the matters presented." *Id.* This certainly could include others affiliated with Zowine in his disagreements with Plaintiff. Finally, the jury was told that Zowine "is presumed to have acted in accordance with his fiduciary duty," and that Plaintiff was required to prove that Zowine breached his fiduciary duties by "clear and convincing evidence." *Id.* These instructions left ample room for Zowine to argue that his disagreements with Plaintiff, and even the events that led to the petition for dissolution, arose from his good faith efforts to act in the best interest of Zoel.

Zowine made such arguments. His counsel asserted in closing argument that Zowine took only those actions he "thoroughly believed [were] in the best interest of the company." Doc. 518 at 87. Zowine's counsel argued that Plaintiff, not Zowine, took actions contrary to the company's interest, and, as a result, "Mr. Zowine was forced to respond and to react to protect his 50 percent interest and to protect the company and to protect the people it serves." *Id.* at 87-88. The jury saw things differently.

Defendants now assert that the Court should have instructed the jury that the law did not prevent Zowine "from disputing how to operate the corporation, even to the point of deadlock or hostile takeovers." Doc. 568 at 6. But that was not Zowine's defense. He did not argue to the jury that he, in good faith, disagreed with Plaintiff to the point of deadlock and dissolution. This was his argument:

> Zowine never took a single action to throw [Plaintiff] out of the company. Not one. He didn't take a single action to dissolve the company. The only action he took that had repercussions to move Mr. Wichansky from the company is to elect to purchase his interest almost two months later after Mr. Wichansky had moved to judicially dissolve the company. . . That's it. You won't find in evidence a single action taken by Zowine that was to dissolve the company that was to tear the company apart.

Doc. 518 at 89.

Defendants cite *AMERCO v. Shoen*, 907 P.2d 536 (Ariz. Ct. App. 1995), for the proposition that under Arizona law a director's failure to disclose his plans for a hostile

corporate takeover is not a breach of fiduciary duty.   Doc. 568 at 6-7.   *AMERCO* addressed a long-running family dispute for control over U-Haul.   907 P.2d at 537. Because U-Haul was incorporated in Nevada, the dispute was controlled by Nevada law. *Id.* at 538 n.1.   The court found that "[d]irectors may promote takeover of a corporation and have no duty to reveal takeover plans to management" because securities law and public policy do "not exist for the benefit of protecting incumbent management from hostile takeover attempts."   *Id.* at 546 (internal quotation marks and citations omitted). *AMERCO* is factually and legally distinguishable from this case, which involves a dispute between co-equal shareholders in a close corporation.[10]   Because Arizona law imposes additional fiduciary obligations on 50-50 shareholders in a closely-held corporation (Doc. 481 at 7-10), the fiduciary obligations owed by shareholders in a publicly-traded corporation provide little guidance.   What is more, *AMERCO* applies Nevada law, not Arizona law.   For these reasons, *AMERCO* is inapposite.

Finally, Defendants seek to distinguish A.R.S. § 29-1034, which sets out the ongoing fiduciary duties during the winding up of a partnership business.   Defendants argue that because Zoel was a corporation, rather than a partnership, Zowine did not owe fiduciary duties during the wind-up period.   Once again, Defendants are mistaken. Plaintiff's fiduciary duty theory did not rely on Defendants' actions that occurred after Plaintiff filed for dissolution.   He focused instead on their actions that caused him to file for dissolution.   The critical issue, therefore, was whether Zowine breached his fiduciary duties prior to Plaintiff's filing for dissolution, not after.   Like the other authorities cited by Defendants, this statute is not relevant.

Defendants had ample opportunities to convince the Court that its proposed jury instructions were erroneous.   Defendants addressed their proposed jury instructions on fiduciary duties when a relationship becomes adversarial (Doc. 486 at 168-172) and on

---

[10] Defendants dispute the characterization of Zoel as a close corporation.   Under Defendants' view, a close corporation in Arizona must be organized under the close corporation statutes, A.R.S. §§ 10-1801 *et seq.*   Defendants' view is incorrect for reasons explained by the Court in a previous order.   *See* Doc. 481 at 7.

corporate deadlock (*id.* at 172-74).   For the reasons stated on the record, in previous orders, and in this order, the Court concludes that the jury instructions did not render the trial unfair to Defendants.  *See Molski*, 481 F.3d at 729.  Defendants' Rule 59(a) motion for a new trial based on the Court's fiduciary duty instructions is denied.

## VI.   Aiding and Abetting Claim is Derivative.

Defendants Johnson, Leon, Shanahan, and Ilardo argue that they cannot be found liable on the aiding and abetting claims because Defendant Zowine is not primarily liable on the breach of fiduciary duty claims.  Doc. 568 at 7.  Because the Court has found no basis to overturn the jury's fiduciary duty verdict, this argument fails.

## VII.   Aiding and Abetting Liability.

Defendants challenge the jury's aiding and abetting verdict on two fronts.  First, they argue there was insufficient evidence to establish that Defendants Johnson, Leon, Shanahan, and Ilardo knew that Zowine was engaging in tortious conduct.  Doc. 568 at 7-8.  This knowledge component does not require actual and complete knowledge of the primary violation; instead, knowledge may be inferred from the circumstances, and the requirement may be satisfied even though the aider and abettor lacked knowledge of all of the details of the primary violation.  *Sec. Title Agency, Inc. v. Pope*, 200 P.3d 977, 988, ¶ 45 (Ariz. Ct. App. 2008) (citing *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Tr. Fund*, 38 P.3d 12, 23, 26, ¶¶ 36, 45 (Ariz. 2002)).  Second, Defendants assert that there was not "any causal connection between the actions of the defendants found liable for aiding and abetting and the damages claimed by Plaintiff."  *Id.* at 7.  "But for" causation is not required; the test is whether Defendants' assistance made it easier for the violation to occur.  *Sec. Title Agency*, 200 P.3d at 988, ¶ 47 (citing *Wells Fargo Bank*, 38 P.3d at 27, ¶ 54).

### 1.   Waiver.

As an initial matter, the Court finds that not all of these issues were raised in the Defendants' Rule 50(a) motion at trial.  Counsel for Defendants argued that Plaintiff had not adduced sufficient evidence on the aiding and abetting claim for Defendants Leon

(Doc. 495 at 167-68), Johnson (*id.* at 168-69), and Ilardo (*id.* at 170), but not Defendant Shanahan.  Nor did Defendants' counsel argue in their Rule 50(a) motion that Plaintiffs had failed to establish a sufficient causal connection between aiding and abetting Zowine's actions and Plaintiff's harm.  Counsel mentioned causation in passing while describing the required elements of aiding and abetting liability (*id.* at 166), but did not advance a causation argument with respect to any Defendants.  Thus, for purposes of Defendants' Rule 50(b) motion, these arguments are deemed waived.  The Court, however, may still consider these arguments under Defendants' Rule 59(a) motion.

### 2.     Defendant Charles Johnson.

As noted above, Plaintiff presented substantial evidence through Ron Wise, Wendy Britton, and others that MGA engaged in widespread and intentional medical billing fraud.  Johnson was at the center of that alleged fraud.  He managed Zoel's home health care division and directly supervised Defendant Martha Leon, the person primarily responsible for the fraud.  Docs. 476 at 102, 105; 479 at 28; 485 at 61, 66, 71, 73, 75; 491 at 95-96.  When billing issues arose, Johnson and Leon were not forthcoming with information.  Doc. 476 at 105.  Johnson reported to Zowine on medical billing matters.  Doc. 479 at 30-31; 483 at 126-27, 131; 492 at 61-65.  After Richard Eden began looking into billing issues, Johnson and Leon were not forthcoming, and Johnson coached Leon in responding.  Doc. 486 at 23-27 ("Nice way to respond and phrase.").  In response to another inquiry about billing issues, Johnson wrote simply "[r]ound up."  *Id.* at 28-30.  Johnson and Zowine attempted to blame the billing issues on Eden and Plaintiff.  Doc. 479 at 84.

In addition, Johnson was heavily involved in Zowine's surreptitious move of employees, equipment, and computers to a separate office from Plaintiff, a step the jury reasonably could have viewed as central to Zowine's plan to drive Plaintiff from the company.  Zowine directed Johnson to move office materials, including computers, from the Plaintiff's location to Zowine's new location.  Doc. 485 at 129.  Johnson participated, despite having no authorization from Plaintiff, the company's president.  *Id.* at 125-27.

Johnson coordinated and spoke at the meeting before the move, which occurred early in the morning in a grocery store parking lot and involved Defendants Ilardo and Shanahan, among others.  Doc. 477 at 47-50; 485 at 127-29, 133.  Johnson was involved in selecting which employees would make the move, excluding employees with close ties to Plaintiff.  Doc. 485 at 132-33.  During the move, Johnson and others took not only their own computers, but also other employees' property.  *Id.* at 126.  They later moved the network servers without Plaintiff's authorization.  *Id.* at 136-39.  Following the move, Johnson returned to Plaintiff's office with legal papers in hand and instructed the employees that Plaintiff was not allowed in his own office and they were not to communicate or engage in business dealings with him.  Docs. 479 at 72; 483 at 78.

In addition, Johnson worked with Plaintiff and Zowine from virtually the start of the company.  He knew their relationship and the nature of their business dealings.  He was closely associated with Zowine in the business.  The jury reasonably could have inferred that Johnson fully understood the issues between Plaintiff and Zowine, including the billing fraud at the center of the problems, and that Zowine was acting to prevent discovery of the fraud by driving Plaintiff from the business.

Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that the jury had sufficient evidence reasonably to conclude that Johnson knew of Zowine's breach of fiduciary duty.

### 3. Defendant Martha Leon.

Leon reported to Johnson, who reported to Zowine.  Docs. 479 at 30-31; 483 at 126-27, 131; 492 at 61-65.  Leon handled medical billing in ways different from standard procedures.  Doc. 488 at 53-55.  Leon was, according to Wise's testimony, at the center of the billing fraud.  She refused to cooperate when Eden, on behalf of Plaintiff, attempted to understand the billing problems.  She knew that rounding up had been occurring in her spreadsheets for several years.  *Id.* at 104-05.  She provided contradictory testimony about her accounting practices, whether she had discussions with Zowine's billing fraud attorney (*id.* at 86-89), and whether she had created the formula

that caused some of the billing fraud (*id.* at 96-98).  She moved with Johnson and the other Zowine loyalists to the new offices.  Viewing the evidence in the light most favorable to sustaining the verdict, the Court concludes that the jury could reasonably conclude that Leon knew Zowine was committing tortious conduct through his involvement in medical billing fraud and his efforts to hide the fraud from Plaintiff.

### 4.      Defendant Pat Shanahan.

Shanahan was a close associate of Zowine.  He was part of the sales group at Zoel that Zowine supervised closely, and sat in the "pit" where Zowine's sales personnel worked.  He would therefore have been familiar with Zowine's open efforts to harass Plaintiff in the office, including his obscene suggestion to Eden and Plaintiff, Zowine's physical assault of Plaintiff, and the time when Zowine arranged for personnel in the pit to stand and salute as Plaintiff walked in and somebody played "Hail to the Chief" on their computer.  Shanahan was also copied on many of the profane and offensive emails Zowine sent to plaintiff.

Shanahan was present at the early morning meeting in a grocery store parking lot when the surreptitious office move was arranged.  Doc. 477 at 47-50.  Shanahan knew that Zowine directed the employees to make the move, that Plaintiff had not approved the move, and that Plaintiff "wasn't going to know."  *Id.* at 45-47, 50.  Shanahan was later involved in removing the network servers from Plaintiff's office.  Doc. 485 at 137-38.  In another incident that occurred after the move, Shanahan blocked Plaintiff from attempting to stop Zowine and others from copying emails at Plaintiff's office.  Doc. 477 at 61.  When he would visit Plaintiff's office after the move with other Zowine loyalists, Shanahan engaged in intimidating and harassing conduct toward Plaintiff and employees loyal to Plaintiff.  And George Prussin – Plaintiff's father-in-law – testified that Shanahan called him on the phone, with Zowine in the room, and asked "how does it feel to know your daughter is married to a pedophile?"  Viewing the evidence in the light most favorable to the jury's verdict, the Court concludes that the jury had ample evidence reasonably to find that Shanahan knew of Zowine's breach of fiduciary duty.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 5.    Defendant Mike Ilardo.

Mike Ilardo was a childhood friend of Zowine's.  Doc. 520 at 171.  Ilardo worked in "the pit" at Zoel and thus would have been familiar with Zowine's public efforts to humiliate Plaintiff and Eden and Zowine's assault of Plaintiff.  Doc. 495 at 10, 12.  Ilardo was present when Zowine played "Hail to the Chief" and had everyone in the pit stand a salute Plaintiff as he entered the office.  *Id.* at 11.  Ilardo was involved in the surreptitious office move, and was present for the parking lot meeting beforehand.  Doc. 477 at 47-48.  Ilardo called some of the employees and invited them to attend the meeting.  Doc. 485 at 128.  After the move, Ilardo and others, including Shanahan, came to Plaintiff's office in black leather jackets and removed the server without Plaintiff's authorization.  Docs. 491 at 39, 495 at 30, 51.  Zowine directed Ilardo and others to take the server.  *Id.* at 32-33, 51.  Ilardo was also present when Zowine attempted to print emails from a computer in Plaintiff's office resulting in a scuffle and police intervention.   Doc. 495 at 35-37.  Viewing the evidence in the light most favorable to the verdict, the Court concludes that the jury had sufficient evidence reasonably to conclude that Ilardo knew of Zowine's breach of fiduciary duty.

### 6.    Causation Evidence.

There was also sufficient evidence for the jury reasonably to find that Defendants' actions made it easier for Zowine to breach his fiduciary duties.  Johnson and Leon were integral to the billing fraud.  Leon was the primary individual responsible for medical billing, and her spreadsheet was a source of the fraud.  Johnson, Shanahan, and Ilardo were all heavily involved in the surreptitious office move.  They were involved in planning, organizing, and executing the move.  Shanahan and Ilardo actively participated in efforts to intimidate Plaintiff and his associates.  Each of these individuals made it easier for Zowine's breach to occur.  Indeed, Plaintiff and other witnesses testified that they feared and were intimidated by Zowine and the Defendants loyal to him.[11]

---

[11] Defendants argue that mere participation in intimidating visits to Plaintiff's office was insufficient to support aiding and abetting liability.  Doc. 568 at 8.  Defendants note that the jury found Defendants Brett Costello, Kai Knowlton, Rio Mayo, and Mike

**VIII.   Compensatory Damages.**[12]

Defendants argue that the compensatory damages award should be remitted because it exceeds the amount calculated by Plaintiff's expert.  Doc. 568 at 8.  The Ninth Circuit has approved the use of remittitur in cases of excessive damages awards:

> When the court, after viewing the evidence concerning damages in a light most favorable to the prevailing party, determines that the damages award is excessive, it has two alternatives.  It may grant defendant's motion for a new trial or deny the motion conditional upon the prevailing party accepting a remittitur.  The prevailing party is given the option of either submitting to a new trial or of accepting a reduced amount of damage which the court considers justified.

*Fenner v. Dependable Trucking Co., Inc.*, 716 F.2d 598, 603 (9th Cir. 1983) (footnote and citations omitted).  Remittitur is appropriate when a jury returns "a verdict that is so grossly excessive as to shock the conscience," *Monsanto Co. v. Ralph*, 382 F.3d 1374, 1384 (Fed. Cir. 2004) (citation omitted), a determination which "'is committed to the sound discretion of the trial court,'" *Williams v. Bridgeport Music, Inc.*, No. CV13-06004-JAK, 2015 WL 4479500, at *28 (C.D. Cal. July 14, 2015) (quoting 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2815 (3d ed. 1998)).

Plaintiff's damages evidence was presented primarily through an expert witness, Dr. Christopher Young.  Dr. Young calculated Plaintiff's net historical losses at $10,360,225.  Doc. 493 at 93.  This amount included profits Plaintiff would have earned from Zoel from the beginning of 2010 through July of 2015; it did not include lost profits for the second half of 2015, any of 2016, or future years.  *Id.* at 80, 84-85, 93-94.  Dr. Young testified that this number was "conservative," and could have been higher.  *Id.* at 80-81.  He also confirmed that Plaintiff continues to lose money "to this day," and that a

---

Narducci not liable for aiding and abetting.  But the evidence discussed above establishes that Defendants Johnson, Shanahan, and Ilardo did more than merely participate in the visits.  Moreover, the fact that the jury distinguished among Defendants shows that it considered the evidence carefully as to each Defendant individually.

[12]  The Court must consider this issue despite the Zowines' bankruptcy filing because it affects Defendants Johnson, Leon, Shanahan, and Ilardo, each of whom was found liable for a percentage of the overall compensatory damages award.

present-day calculation of damages "would be higher."  *Id.* at 84-85.

The jury returned a verdict of $11,000,000 in compensatory damages, which was $639,775 – or about 6.2% – higher than Dr. Young's calculation.  Viewing the evidence in the light most favorable to the verdict, the Court cannot conclude that this award is excessive.  An additional 6.2% could represent a modest approximation of Plaintiff's losses after July 2015, particularly given Dr. Young's estimate that Plaintiff's lost annual profits were more than $2,600,000.  In addition, the damage award is consistent with Dr. Young's testimony that his calculation was conservative.  Dr. Young confirmed that Plaintiff was continuing to suffer damages not reflected in his calculation, the Court instructed the jury that compensatory damages could include lost salary and profits (Doc. 533 at 14), and Zowine himself testified that Zoel continued operations in 2016 and remained profitable.  Given these facts, the jury did not act unreasonably in awarding compensatory damages that exceeded Dr. Young's calculation by $639,775.[13]

## IX.   Punitive Damages under Rules 50 and 59.

Defendants argue that punitive damages are not appropriate because Plaintiff failed to present sufficient evidence that Defendants' conduct was "aggravated, outrageous, and performed with an 'evil mind.'"  Doc. 568 at 9-10.  Defendants seek relief under both Rule 50(b) and Rule 59(a), but Defendants' Rule 50(a) argument addressed punitive damages only with respect to Zowine, not Johnson, Leon, or Shanahan.  Doc. 495 at 172-73.  The Rule 50 argument is waived as to these Defendants, and the Court must consider whether punitive damages awarded against them were appropriate under Rule 59(a).

In Arizona, punitive damages may be awarded in aiding and abetting cases.  *Sec. Title Agency*, 200 P.3d at 995, ¶ 82 (citing *Rodgers v. Bryan*, 309 P.2d 773, 778 (Ariz. 1957)).  Under Rule 59(a), a court may consider a party's claim of excessive damages,

---

[13] Defendants assert that the Court's failure to offset the state court's $5 million valuation of Zoel results in a double recovery and fails to give full faith and credit to the state court's judgment.  Doc. 568 at 8 n.5.  The Court has dealt with this argument at length, and has rejected it for reasons stated in several previous orders.  *See* Docs. 425, 428, 524 at 4-5, 534 at 5-8.

*Molski*, 481 F.3d at 729, and order a new trial if the award is contrary to the clear weight of the evidence, *Passantino*, 212 F.3d at 510 n.15.

The Court cannot conclude that assessing punitive damages against Defendants Johnson and Leon was contrary to the clear weight of evidence. As discussed above, there was substantial evidence implicating both Johnson and Leon in the medical billing fraud. Knowledge of and participation in deliberate fraud, and then assisting Zowine in attempting to hide it, even at the cost of driving another partner from the business, surely satisfies the Arizona requirement of an "evil mind." As the Arizona Supreme Court has explained, an evil mind "may be found where defendant intended to injure the plaintiff. It may also be found where, although not intending to cause injury, defendant consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others." *Rawlings v. Apodaca*, 726 P.2d 565, 578 (Ariz.1986).

There was also substantial evidence implicating Johnson and Shanahan in Zowine's campaign to drive Plaintiff from the company. Johnson was the primary person who organized the surreptitious office move, which was deliberately concealed from Plaintiff, and he later returned to Plaintiff's office and instructed the employees not to communicate with Plaintiff. Shanahan was involved in both the office move and the moving of a server, both of which were concealed from Plaintiff. And Shanahan was among the employees of Zowine who came to Plaintiff's office several times and sought to intimidate Plaintiff and other employees. Shanahan also claimed to Plaintiff's father-in-law that Plaintiff was a pedophile. This satisfies the Arizona "evil mind" standard.

Defendants contend that punitive damages awards against Johnson, Leon, and Shanahan are inappropriate because Plaintiff's counsel did not specifically request such damages during his closing argument. Docs. 568 at 9-10; 583 at 7. But Defendants cite no authority for the proposition that punitive damages may be awarded only if they are requested in closing argument. The Court's jury instructions stated that punitive damages could be awarded in this case, and set forth the proper standard for awarding them. Doc. 533 at 23. Defendants do not contend that these instructions were improper.

1    The Court will not grant Rule 59(a) relief based on the jury's decision to assess

2    punitive damages awards against Defendants Johnson, Leon, and Shanahan.

3    **X.    Constitutionality of the Punitive Damages.**

4            Defendants argue that the punitive damages awards are constitutionally excessive.

5    Doc. 568 at 10-12.  Defendants seek remittitur or a new trial for the punitive damages

6    assessed against Defendants Zowine, Shanahan, and Johnson.  Once again, the Court will

7    not consider Defendants' argument with respect to Zowine based on the bankruptcy stay.

8            "The purpose of punitive damages is not to compensate the plaintiff, but to express

9    society's disapproval of outrageous conduct and to deter such conduct by the defendant

10   and others in the future."  *Hawkins v. Allstate Ins. Co.*, 733 P.2d 1073, 1080 (Ariz. 1987)

11   (citations omitted).  The Due Process Clause of the Fourteenth Amendment "imposes a

12   substantive limit on the size of punitive damages awards."  *Honda Motor Co., Ltd. v.*

13   *Oberg*, 512 U.S. 415, 420 (1994) (citations omitted).  The Supreme Court has provided

14   two relevant guideposts for reviewing punitive damages awards: "(1) the degree of

15   reprehensibility of the defendant's misconduct; [and] (2) the disparity between the actual

16   or potential harm suffered by the plaintiff and the punitive damages award."  *Sec. Title*

17   *Agency*, 200 P.3d at 998, ¶ 94 (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538

18   U.S. 408, 418 (2003)).[14]

19           With respect to the first guidepost, courts are directed to consider several factors,

20   none of which is dispositive on the issue of reprehensibility.  *Id.*, ¶ 95 (citing *State Farm*,

21   538 U.S. at 419).  Courts should consider whether:

22           the harm caused was physical as opposed to economic; the tortious conduct
23           evinced an indifference to or a reckless disregard of the health or safety of
             others; the target of the conduct had financial vulnerability; the conduct
24

25           [14] A third guidepost, the difference between the punitive damages awarded by the
26   jury and the civil penalties authorized or imposed in comparable cases, is not relevant
     when liability is based on a common-law tort.  *Sec. Title Agency*, 200 P.3d at 998, ¶ 94
27   n.19 ("We do not analyze the third guidepost because it neither weighs for nor against the
     punitive damages award in this case.  Aiding and abetting is a common-law tort, and we
     agree with the Tenth Circuit that 'a violation of common law tort duties [may] not lend
28   [itself] to a comparison with statutory penalties.'") (quoting *Cont'l Trend Res., Inc. v.*
     *Oxy USA Inc.*, 101 F.3d 634, 641 (10th Cir. 1996)).

involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id.* (citing *State Farm*, 538 U.S. at 419).

With respect to the second guidepost, in the case of a substantial compensatory damages award, "a 1:1 ratio" between compensatory and punitive damages "is a fair upper limit." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 513 (2008); *see also Sec. Title Agency*, 200 P.3d at 1000-01, ¶¶ 103-08 (reducing punitive damages to $6,100,290, representing a 1:1 ratio to compensatory damages). The Supreme Court has made clear that there is no bright-line ratio that punitive damages may not exceed. *Sec. Title Agency*, 200 P.3d at 1000, ¶ 103 (citing *State Farm*, 538 U.S. at 424).

### A.   Pat Shanahan.

Defendants argue that the punitive damages imposed against Defendant Shanahan are unconstitutionally excessive. Doc. 568 at 12-15. The Court agrees.

The jury found Shanahan responsible for $27,500 of the compensatory damages (Doc. 500 at 2-4) and $750,000 in punitive damages (*id.* at 5). The jury was justified in finding Shanahan's conduct reprehensible. He was a full participant in efforts to harass Plaintiff and those loyal to him; he used intimidation at the request of Zowine; he characterized Plaintiff as a pedophile; and he was fully aware of the hostile and demeaning actions of Zowine that he was supporting. This conduct included repeated actions, not an isolated incident, and was intentional, not negligent.

But the Court finds the 1 to 27 ratio between Shanahan's compensatory and punitive damages to be clearly excessive. The jury found that Shanahan caused only .25% of the damages suffered by Plaintiff, resulting in an award of $27,500. Doc. 500 at 4. The Court can see no basis in the evidence to hold Shanahan accountable for 27 times more in punitive damages, reprehensible though his conduct was. Considering all of the evidence, the Court concludes that the punitive damages against Shanahan should be reduced to $55,000, which represents a 1:2 ratio. This ratio furthers the purposes of punitive damages, respects the jury's finding of reprehensibility, and yet preserves

1   Shanahan's Fourteenth Amendment rights.

2         **B.**    **Charles Johnson.**

3         The jury found Johnson responsible for $550,000 of the compensatory damages
4   (Doc. 500 at 2-4) and $1,500,000 in punitive damages (id. at 5).  The Court agrees that
5   these punitive damages are unconstitutionally excessive.

6         Johnson engaged in reprehensible conduct, sanctioning fraud and helping to
7   conceal it even at the cost of driving Plaintiff from his business.  But the compensatory
8   damages award against Johnson was substantial, and the Court concludes that punitive
9   damages three times greater than such an award are clearly excessive.  *State Farm Mut.*
10  *Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) ("When compensatory damages are
11  substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach
12  the outermost limit of the due process guarantee.").  The Court concludes that the
13  punitive damages award against Johnson should be reduced to $550,000, which
14  represents a 1:1 ratio.  This ratio furthers the purposes of punitive damages, respects the
15  jury's assessment of reprehensibility, and preserves Johnson's Fourteenth Amendment
16  rights.[15]

17  **XI.**    **Security for Stay Pending Appeal.**

18        The Court has previously issued orders addressing the supersedeas bonds required
19  to secure Plaintiff's judgment pending resolution of Defendants' post-trial motion.
20  Docs. 551, 559, 572.  Defendants Johnson, Leon, Shanahan, and Ilardo have posted
21  surety bonds that satisfy the Court's orders.  Docs. 576, 577, 578, 579.

22        For purposes of appeal, Defendants Leon's and Ilardo's existing bonds are
23  sufficient.  Defendant Johnson should post a bond in the amount of $1,100,000 for
24  appeal, and Defendant Shanahan may reduce his bond for appeal to $82,500.

25        **IT IS ORDERED:**

26        1.     Defendants' renewed motion for judgment as a matter of law and for a new

27  _____

28        [15] The $500.00 award of punitive damages against Defendant Leon raises no constitutional concerns.

trial (Doc. 568) is **granted in part** and **denied in part** with respect to Defendants Charles Johnson and Pat and Sarah Shanahan as set forth above.

2.     The motion is **denied** with respect to Defendants Martha Leon and Michael and Alisa Ilardo as set forth above.

3.     The proceedings as to Defendants David Zowine and Karina Zowine remain stayed due to their bankruptcy filing.

4.     The bonds of Defendants Martha Leon and the Ilardos are sufficient for appeal.

5.     Defendants Pat and Sarah Shanahan may post a bond in the amount of $82,500 to stay execution during the appeal.

6.     Defendant Charles Johnson shall post a bond in the amount of $1,100,000 to stay execution of the judgment on appeal.

Dated this 31st day of August, 2016.


David G. Campbell
United States District Judge